984 So.2d 685 (2008)
Kelly G. AUCOIN, et al.
v.
SOUTHERN QUALITY HOMES, LLC, et al.
No. 2007-C-1014.
Supreme Court of Louisiana.
February 26, 2008.
*687 Voorhies & Labbe, Lamont Paul Domingue, Lafayette, for applicant.
Patterson F. Willis, Jr., for respondent.
VICTORY, J.
We granted this writ application to determine whether the manufacturer of a mobile home is liable for redhibitory defects in the mobile home. After reviewing the record and the applicable law, we find that the manufacturer is liable to the plaintiff for redhibitory defects existing at the time the mobile home was delivered to the seller and for appropriate damages thereunder.

FACTS AND PROCEDURAL HISTORY
Kelly G. Aucoin ("plaintiff") purchased a mobile home and land from Southern Quality Homes, LLC (the "seller") on July 6, 2001 for $93,980.00. The mobile home had been delivered to Southern Quality Homes' lot by Dynasty Homes (the "manufacturer") in January, 2000. A pre-occupancy inspection report listed numerous defects in regard to the mobile home; however, Southern Quality Homes assured plaintiff they were minor and would be repaired. Plaintiff alleged that after the delivery and set-up of the mobile home, he and his wife, Cindy, began to experience problems with the home. The Aucoins contacted Southern Quality Homes and Dynasty Homes numerous times regarding these defects, and several attempts at repair were made by the manufacturer.
Plaintiff ultimately filed suit against Southern Quality Homes and Dynasty Homes, alleging redhibitory defects and seeking to hold the two defendants solidarily liable for recision of the sale, including the price of the land, damages and expenses.[1] At trial, the plaintiff presented expert witness testimony that the principal defect in the home was a moisture problem that caused a proliferation of mold, and that the manufacturer was responsible for several defects that related to the infiltration of moisture, including improper installation of the vinyl vapor barrier, improper sealing of the marriage line, improper fastening and installation of the roof and roof shingles, improper installation of vinyl siding, and improper installation of drywall on the ceiling. The plaintiff also produced a document dated October 17, 2000, wherein Southern Quality Homes requested service from Dynasty Homes because the ceiling in the master bedroom had a leak and needed repair, indicating that defects relating to the moisture problem were present in the home when the home was delivered by the manufacturer to the seller.
The trial court found in favor of the plaintiff, relying heavily on the above mentioned testimony of the plaintiff's expert witnesses. Specifically the trial court gave "great weight" to Ervin Ritter's[2] testimony *688 that the home had a moisture problem because the roof and the top plate were not sealed properly, which was a code violation, and that the marriage line between the two sections of the mobile home had not been properly sealed. The trial court also found Alexis Mallet's[3] testimony "extremely well documented, thoroughly researched and based on sound construction standards and entitled to a great deal of weight." The trial court found that "one of the main problems that Mr. Mallet noticed was that the roof and the siding had not been applied properly," and that of the 30 homes in the subdivision, this was the only one to sustain roof damage in Hurricane Rita, which the trial court found corroborated his testimony that the roof was not installed properly. In addition, when asked which party caused the air infiltration problems, Mr. Mallet testified as follows:
Q. Okay. Air infiltration problems that you've testified to, those would not be anything the dealer did, that would be the manufacturer would it not?
A. Yes, sir.
Q. Okay. So you don't really see anything, anything in your finding that has any significant associations with anything the dealer did?
A. Nothing of any significance.
The trial court also credited Mr. Mallet's opinion that repairing the home would not be an option as the cost of repairs would greatly exceed the value of the home and noted that "this is the primary reason that the Court finds that the proper remedy for this redhibition suit is refund of entire purchase price."[4] In addition, the trial court inspected the home and noted the following:
"[t]he Court visually walked through the home at the request of all counsel and was especially troubled by the obvious condition of the siding having deflections or bowing, and the fact that the underside of the home had not been sealed properly. The Court was not able to get on the roof and look at the roof problems described by Mr. Mallet nor was the Court able to get in the attic and notice the improper sealing problems mentioned by Mr. Mallet. However, the Court finds his testimony to be credible and accepts his testimony on these issues. The `gap' between the wall and the ceiling was obvious. You could actually see light from outside through the crack."
The trial court concluded that:
[t]he main and principle [sic] defect in this mobile home is the moisture problem causing the mold and eventual deterioration of the home. The main cause of the moisture problem, the Court finds, is the improper sealing of the *689 marriage lines[5] in the roof and underside of the home and top plate. The construction defects in the home show poor quality workmanship throughout, and though some problems are minor and are easily repaired, taken as a whole, the plaintiffs have satisfied their burden under the redhibition articles.
Recognizing that the seller had filed for bankruptcy, the trial court held the manufacturer and the seller solidarily liable for these redhibitory defects. Finally, the trial court held the manufacturer liable for nonpecuniary damages under La. C.C. art. 1998, finding a "significant nonpecuniary interest in the fact that the Aucoins decided to upgrade and buy this new mobile home to satisfy their desire to achieve the American dream and to have a new, much finer home so that they could live more comfortably, worry free, and entertain family and friends." The total damages awarded were the $93,980.00 purchase price for the home and land, $4,190.33 for closing costs, $1,000 for dirt work, $25,000 for mental pain and suffering, $25,000 in attorney fees, $25,000 in expert fees, $288.18 for medical bills, $285.00 for prescription bills, and $6,446.13 for insurance and taxes.
The court of appeal affirmed the trial court's judgment. Aucoin v. Southern Quality Homes, LLC, 06-979 (La.App. 3 Cir. 2/28/07), 953 So.2d 856. The court of appeal rejected the manufacturer's argument that the 1996 amendments to La. C.C. arts. 2323[6] and 2324[7] applied to redhibition *690 and instead chose to rely on "the clear legislative intent expressed in La. Civ.Code art. 2545 to hold manufacturers and sellers generally solidarily bound to help protect consumers." 953 So.2d at 861. The court of appeal further found that "[i]n order for Dynasty not to be held solidarily bound with Southern Quality, it must show that the redhibitory defects present in the home sold to Aucoin were solely caused by Southern Quality." Id. The court of appeal found no manifest error in the trial court's factual finding that both the seller and manufacturer were at fault in causing the redhibitory defect. Id. at 862. The court of appeal likewise rejected the manufacturer's other arguments, finding that the manufacturer was liable for improper setup and sealing of the home; that damages, including the cost of the land, closing costs, and mental pain and suffering were appropriate; and that the expert fees awarded were not excessive. Id. at 863. We granted Dynasty Homes' writ application to determine whether it is liable for the redhibitory defects in this mobile home, and, if so, the appropriate damages thereunder. Aucoin v. Southern Quality Homes, LLC, 07-1014 (La.6/29/07), 959 So.2d 516.

DISCUSSION
The statutory law relative to redhibition is contained in Title VII of the Louisiana Civil Code governing "Sale." La. C.C. art. 2520 states the warranty against redhibitory defects as follows:
The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.
A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its *691 value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.[8]
La. C.C. art. 2530 provides in pertinent part that "[t]he warranty against redhibitory defects covers only defects that exist at the time of delivery."
The extent of a seller's liability to a buyer for breaching this warranty depends on whether the seller knew, or did not know, of the defect. La. C.C. art. 2531 provides:
A seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails so to do, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, less the credit to which the seller is entitled if the use made of the thing, or the fruits it has yielded, were of some value to the buyer.
A seller who is held liable for a redhibitory defect has an action against the manufacturer of the defective thing, if the defect existed at the time the thing was delivered by the manufacturer to the seller, for any loss the seller sustained because of the redhibition. Any contractual provision that attempts to limit, diminish or prevent such recovery by a seller against the manufacturer shall have no effect.
On the other hand, the liability of a seller who knows of the defect is greater:
A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.
A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.
La. C.C. art. 2545.
In Young v. Ford Motor Co., Inc., 595 So.2d 1123 (La.1992), we explained the Roman origins of the redhibitory action and that its purpose was to protect buyers from latent defects undisclosed by corrupt dealers. "This important aspect of our current law on sales (i.e., this system of implied warranty against latent defects and vices) was fully incorporated into Louisiana law." Id. (See e.g., Louisiana Civil Code of 1808, Art. 66[9] and Art. 71[10]) "The *692 purpose of the redhibition action in Louisiana, as was the case in Roman law, has been to restore the status quo." Id. (Citing Floyd W. Lewis, Comment, Warranty of Quality in Louisiana: Extent of Recovery under the Implied-In-Law Warranty, 23 Tul. L.Rev. 130, 131 (1948); Savoie v. Snell, 213 La. 823, 35 So.2d 745, 746 (1948). "The seller in good faith had only to restore the purchase price paid and any expenses incurred (Article 2509, La. Civil Code of 1825), while the seller in bad faith was also liable in damages. Article 2523, La. Civil Code of 1825)." Id. Thus, an action in redhibition entitles the buyer to annul the sale and recover the purchase price, rather than being limited to recovering the cost of curing any such substantial defects. Rey v. Cuccia, 298 So.2d 840 (La.1974); Prince v. Paretti Pontiac Co., Inc., 281 So.2d 112 (La.1973).
Although the code articles on redhibition appear to only allow a suit by a buyer against a "seller" for redhibitory defects, this Court held in Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc., 262 La. 80, 262 So.2d 377 (1972), that the buyer could recover directly from the manufacturer for breach of warranty, despite the fact that there was no privity of contract between them. In Media Production, the Court stated:
Louisiana has aligned itself with the consumer-protection rule, by allowing a consumer without privity to recover, whether the suit be strictly in tort or upon implied warranty. Marine Ins. Co. v. Strecker, 234 La. 522, 100 So.2d 493 (1958); LeBlanc v. Louisiana Coco Cola Bottling Co., 221 La. 919, 60 So.2d 873 (1952).
We see no reason why the rule should not apply to the pecuniary loss resulting from the purchase of a new automobile that proves unfit for use because of latent defects. The pecuniary loss resulting from an unusable vehicle is recoverable when there is an Express warranty without privity. [Cites omitted.] Although there is a split of authority on the question, we find no adequate reason for not applying the same rule and allowing recovery when there is an Implied warranty without privity. [Cites omitted.]
262 So.2d at 380-81. After this analysis, the Court held "that Mercedes-Benz of North America, Inc. [the manufacturer], is solidarily liable with [the seller] for the price of the automobile and other allowable expenses." Id.
Two years later, in Rey v. Cuccia, supra, this Court relied on Media Productions to hold the manufacturer of a trailer solidarily liable with the seller for a redhibitory defect which existed at the time the manufacturer sold the trailer to the seller. See also Womack and Adcock v. 3M Business Products Sales, Inc., 316 So.2d 795 (La.App. 1 Cir.1975) (holding that "since the now famous case of Media Pro. . . ., the buyer's action for breach of implied warranty has been extended to all sellers in the chain of sales back to the primary manufacturer"). The Court in Rey held that "[t]he consumer's action is enforceable against the manufacturer at the same time and at least within the same year following the sale to the consumer, Article 2534, as it is enforceable against the seller." 298 So.2d at 845. The Court further held that because the manufacturer is presumed to know of defects, the one-year limitation of Article 2534 does not apply and the consumer may institute the action to recover for the redhibitory defect within the year *693 following his discovery of it. Id. (Citing La. C.C. art. 2546).[11]
Although Media Production and Rey held the manufacturer and seller were solidarily liable for the defects at issue, we need not reach the correctness of that issue, as we find that the manufacturer is independently liable under those cases for redhibitory defects that existed at the time of delivery to the seller.[12]
Under La. C.C. art. 2520, the seller warrants the product he sells to be free of redhibitory defects, and under La. C.C. art. 2531, the seller is liable to the buyer even for redhibitory defects he was not aware of, including those that were the fault of the manufacturer. In such a case, the seller is responsible for correcting the defect, or, if he is unable to do so, he must return the purchase price with interest, plus reimburse the buyer for his reasonable expenses; however, he has an action against the manufacturer for any defects which "existed at the time the thing was delivered by the manufacturer to the seller." La. C.C. art. 2531. On the other hand, while a buyer may sue a manufacturer directly for redhibitory defects, the manufacturer is liable but only for defects "resulting from the original manufacture" of the product. Rey v. Cuccia, supra at 845.[13]
Thus, whether the manufacturer is solidarily liable with the seller for redhibitory defects is immaterial in this case, as the manufacturer is directly liable for redhibitory defects resulting from the original manufacture of the product. In this case, although the lower courts held that the manufacturer and seller were solidarily liable for the redhibitory defects, the trial court found, and the court of appeal affirmed, that the redhibitory defects were manufacturing defects, for which the manufacturer would be independently liable.
Dynasty Homes argues that the trial court's findings in this regard are manifestly erroneous and that other laws governing the manufacture, sale, and installation of mobile homes, namely, the "Uniform Standards Code for Manufactured Housing," La. R.S. 51:911.21, et seq., (the "USCMH"), mandate a different result.
*694 La. R.S. 51:911.23 provides that "[a]ll new manufactured homes which are sold or offered for sale in this state must be in compliance with the Code and the requirements of this Part" and that "[i]n any redhibitory action brought against the seller of a manufactured home or mobile home, the standards set forth in the Code shall be considered in establishing and determining whether or not a defect exists." The "Code" means "the National Manufactured Home Construction and Safety Standards Act of 1974, 42 U.S.C. 5401 et seq., as amended, and federal regulations promulgated pursuant thereto, along with any construction or installation-related standards adopted by the Louisiana Manufactured Housing Commission." La. R.S. 51:911.22(1). "Seller" is not defined. The warranty required by the USCMH provides as follows:
A. Each new manufactured home, sold as such shall be covered by warranties that shall protect only the first retail purchaser of the manufactured home, for a period of one year from the date of the purchase, in accordance with the terms of the warranty:
(1) The manufacturer shall warrant, in writing, that the manufactured home was in compliance with the Code and the requirements of this Part at the time of manufacture.
Further, the manufacturer shall warrant that the manufactured home was manufactured free from any defects in materials or workmanship as outlined in the Code.
(2) The installer shall warrant that the manufactured home was installed according to the Minimum Standards for Installation of Manufactured Homes (R.S. 51:912.21 et seq.).
(3) The manufacturer, retailer, or installer shall not be liable for any defect in the manufactured home which is the result of improper setup, moving, or defects in work or materials done or furnished by persons other than the manufacturer, retailer, or installer.
B. Manufactured homes sold as used manufactured homes shall not be covered by a warranty unless provided for in writing outlining the terms and conditions of the warranty.
C. The warranty required by this Part shall be in addition to and not in derogation of any other warranties, rights, and privileges which the buyer may have under any other law or instrument. The buyer may not waive his rights under this Part and any such waiver is hereby prohibited as contrary to public policy and shall be unenforceable and void.
La. R.S. 51:911.25. In addition, the installation may only be performed by the homeowner or a Louisiana licensed installer and must be performed in strict compliance with the Minimum Standards for Installation of Manufactured Homes. La. R.S. 51:912.27(B). To strictly comply with Louisiana's minimum standards, the licensed installer must install the home in compliance with the manufacturer's instruction and seal the marriage line on all multi-sectional homes "at the ceiling line, the floor line, and the end walls to restrict any air flow into the home." La. R.S. 51:912.22(1), (9).
Finally, La. R.S. 51:911.24.1(C) provides:
C. Notwithstanding the terms of any franchise, sales, or other contractual agreement, each manufacturer shall indemnify and hold harmless its retailers against any judgment for damages, including but not limited to court costs and reasonable attorney fees of the retailer, arising out of complaints, claims, or lawsuits including but not limited to strict liability, negligence, misrepresentation, express or implied warranty, or *695 rescission of sale to the extent that the judgment arises out of alleged defective or negligent manufacture, assembly, or design of manufactured homes, parts, or accessories or other functions of the manufacturer, which are beyond the control of the retailer.
A violation of the USCMH subjects the violator to civil penalties. La. R.S. 51:911.39.
A reading of these sections reveals that the warranty provided by the USCMH is not exclusive, but is "in addition and not in derogation of any other warranties, rights, and privileges which the buyer may have under any other law or instrument," such as redhibition. However, "in any redhibitory action against the seller," the standards set out by the Code must be considered in determining whether a redhibitory defect exists. Finally, the manufacturer must indemnify and hold harmless its retailers against any judgment "aris[ing] out of alleged defective or negligent manufacture, assembly, or design of manufactured homes, parts, or accessories or other functions of the manufacturer, which are beyond the control of the retailer." La. R.S. 51:911.24.1(C). After reviewing the USCMH, we find that it is in line with the Code articles on redhibition, which recognize that the seller is liable for redhibitory defects even if they are, in fact, manufacturing defects, but that the seller has an action against the manufacturer if the defect existed at time of delivery to the seller. Since manufacturers can be sued in redhibition in the absence of a contract, the manufacturer is liable for defects existing at time of delivery to the seller.
Further, while the USCMH requires the installer to install the home and seal the marriage lines according to specific standards, this does not preclude a finding that the redhibitory defects in this case were manufacturing defects. In addition to the improper sealing of the marriage lines, the trial court found numerous other redhibitory defects based on the plaintiff's expert witnesses' testimony that were clearly attributable to the manufacturer and which contributed to the moisture problems. As we stated in Young, supra, "[m]ultiple defects can collectively form the basis of a redhibitory action even though many of the defects are minor or have been repaired." 595 So.2d at 1126. Thus, we find no manifest error in the trial court's finding that manufacturing defects were redhibitory. Because the manufacturer is presumed to know of manufacturing defects, he is liable for "the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees." La. C.C. art. 2545.
The manufacturer next argues that the trial court erred in holding it liable for the cost of the land and closing costs. It is undisputed that the manufacturer sold only the home to the seller, while the seller sold the home and land to the buyer for $93,980.00. The Third Circuit affirmed the trial court's holding by applying La. C.C. art. 2540, which provides that "[w]hen more than one thing are sold together as a whole so that the buyer would not have bought one thing without the other or others, a redhibitory defect in one of such things gives rise to redhibition for the whole." The court of appeal's holding was in error.
As early as 1894, this Court held that the principles contained in La. C.C. art. 2540 (1870) apply "only when the things sold are dependent upon each other, so that the defect of one renders the other useless and without value." C.S. Burt Co. v. Laplace, 46 La. Ann. 722, 15 So. 293 (La.1894). In this case, there was no evidence *696 presented that defects in plaintiff's home rendered the land useless and without value such that plaintiff will be prevented from using the land in the future. Further, the manufacturer had nothing to do with the development and sale of the land to plaintiff. There is simply no legal basis under Louisiana law for holding the manufacturer of a mobile home liable for the recision of the sale of the land simply because it was sold jointly with the home by the seller. Further, such a holding could lead to absurd results. For example, if plaintiff had purchased 100 acres of valuable land for $1,000,000 as part of a package deal with a defective $50,000 mobile home from a seller, it would be absurd to hold the manufacturer of the mobile home liable to the plaintiff for the value of the land. Thus, we find that the lower courts erred in holding the manufacturer liable for the purchase price of the land and closing costs associated with the land.
Next, the manufacturer argues that the lower courts erred in awarding mental pain and suffering damages in this redhibition suit. First, the manufacturer argues that mental pain and suffering damages in this case are not allowed under the standards enunciated in Young for the award of nonpecuniary damages in a redhibition case. In addition, the manufacturer argues that the Louisiana Product Liability Act (the "LPA") provides the exclusive means of recovery for such damages, and plaintiff dismissed his LPA claim at the beginning of trial.
La. C.C. art. 1998 provides:
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
In Young, supra, where this Court was faced with the issue of whether nonpecuniary damages were awardable in a redhibitory action, we held:
. . . under Article 1998, which is the controlling article for the type of damages referred to by the redhibition articles (specifically Article 2545), if it can be established that the obligee intended  and if the nature of the contract supports this contention  to gratify a significant nonpecuniary interest by way of the contract, and that the obligor either knew or should have known that failure to perform would cause nonpecuniary loss to the obligee, then the requirements for recovery of nonpecuniary damages are satisfied.
595 So.2d at 1133.
The court of appeal found that the plaintiff proved a nonpecuniary interest by his testimony that he formerly lived in a small, 30-year-old mobile home and that he was purchasing this home to entertain family and friends and to live "the American Dream." However, as we stated in Young, the obligee must intend "to gratify a significant nonpecuniary interest by way of the contract," and the obligor must or should know that failure to perform would cause nonpecuniary loss. Regardless of whether plaintiff has or has not proven that he intended to gratify a significant nonpecuniary interest, he presented no evidence that the manufacturer knew or should have known that his failure to perform *697 would cause nonpecuniary loss.[14] Further, there was no evidence presented that the manufacturer "intended, though his failure, to aggrieve the feelings of the obligee" as required by La. C.C. art. 1998. Thus, we find that the lower courts erred in awarding damages for mental pain and suffering and the associated costs of medical bills and prescriptions.
Lastly, the manufacturer argues that the lower courts erred in awarding plaintiff excessive witness fees as damages and in awarding prejudgment legal interest thereon. A court has authority to render a "judgment for costs" and "[c]ourts have great discretion in assessing court costs." Cajun Elec. Power Co-op., Inc. v. Owens-Corning Fiberglass Corp., 616 So.2d 645, 646, 647 (La.1993) (citing La. C.C.P. art. 1920). "Expert witness fees are taxed as costs and, once fixed, form a part of the final judgment" under La. R.S. 13:3666. Id. La. R.S. 13:3666 provides:
A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:
(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.
(2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause.
C. In either manner provided in Subsection B, the court shall also determine and tax as costs, to be paid by the party cast in judgment, the reasonable and necessary cost of medical reports and copies of hospital records.
D. In all civil cases in which the trial court, on its own motion or on motion of a party, has appointed a person who is registered as a professional land surveyor, pursuant to R.S. 37:693(B)(4), to be called as an expert to assist it in the adjudication of any case in which professional land surveying skills may aid the court, the court shall make arrangements for the timely payment of reasonable and customary fees for the services sought to be rendered.
In this case, the trial court awarded plaintiff $20,000.00 in expert fees as "damages." The manufacturer claims that by characterizing the expert fees as "damages," instead of taxing them as costs, the lower courts increased the expert fees beyond "the value of time employed and the degree of learning skill required" as required by La. R.S. 13:3666. The manufacturer also argues that the $20,000.00 in fees for the work of Mr. Mallet was excessive.
*698 The trial court characterized Mr. Mallet as "plaintiff's main witness" with "extensive experience in housing and repair, including manufactured housing." The court remarked that Mr. Mallet testified both at length, had an extremely well documented report with photographs, and that his testimony and report outlined specifically all the problems in the mobile home, cross-indexed to the provisions of the National Manufactured Housing Construction and Safety Standards. In awarding expert witness fees, the court found that "[e]xpert witness fees in the amount of $20,000.00 requested by the plaintiff for pre-trial and trial work on the part of the experts is reasonable" and that the $20,000.00 testified to by Mr. Mallet was exclusive of his trial preparation and testimony. In an amended judgment, the trial court awarded $5,000.00 for expert fees of Mr. Ritter, to bear interest from the date the judgment is signed. In affirming this award, the court of appeal found that the trial court did not abuse its discretion, given that the experts spent considerable time and effort performing the tests at plaintiff's home and preparing for trial, and that they testified regarding a very complex issue for an extensive three-day trial. 953 So.2d at 864. Like the court of appeal, we find that the trial court did not abuse its discretion in awarding expert witness fees of $25,000.00.
However, as we held in Cajun Electric, "interest accrues on an award of expert witness fees taxed as court costs from the date of judgment fixing such fees." 616 So.2d at 647. Regarding the $20,000.00 awarded for Mr. Mallet's expert witness fees, it was error for the lower courts to award these fees as damages bearing pre-judgment interest from the date of judicial demand. The entire expert witness fees should have been taxed as costs pursuant to La. R.S. 13:3666, with interest accruing from the date of judgment.

CONCLUSION
The manufacturer is directly liable to the buyer for redhibitory defects which exist at the time the manufacturer sold and delivered the product to the seller. In this case, the lower courts did not err in finding redhibitory defects existed for which the manufacturer was responsible and in holding the manufacturer liable for damages pursuant to La. C.C. art. 2545. However, in its assessment of these damages, the lower courts erred in several respects. First, the manufacturer is only liable for the return of the purchase price of the mobile home with interest from the time it was paid and for reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the mobile home, plus reasonable attorney fees as were properly awarded by the lower courts. The price of the land should not be included in this amount because the evidence did not show that the requirements of La. C.C. art. 2540 were met. Accordingly, on remand, the trial court must determine what amount of the $93,980.00 was for the mobile home and what was for the land, and what amount of the closing costs and dirt work were associated with the mobile home itself. The $25,000 attorney fee award was appropriate and should not be disturbed. In addition, the lower courts erred in awarding $25,000.00 in mental pain and suffering damages because the plaintiff failed to show that the manufacturer knew or should have known that its failure to perform his obligations would result in nonpecuniary losses. Finally, the trial court did not abuse its discretion in awarding $25,000.00 in expert witness fees, but did err in awarding $20,000.00 of that amount as damages bearing interest from the date of judicial demand. On remand, the trial *699 court must tax the entire $25,000.00 as costs bearing interest from the date of judgment.

DECREE
For the reasons expressed herein, the judgment of the court of appeal is affirmed in part and reversed in part and the case is remanded to the trial court for further proceedings.
AFFIRMED IN PART; REVERSED IN PART; REMANDED TO TRIAL COURT.
KNOLL, Justice, dissents in part and assigns reasons.
KNOLL, Justice, dissenting in part.
I agree with the majority that the manufacturer is directly liable for redhibitory defects resulting from the manufacture of the mobile home under La. Civ.Code art. 2545, and under the facts of this case, the manufacturer is so liable. However, I find the majority errs in reversing the trial court's award of $25,000 for mental pain and suffering in nonpecuniary damages.
The majority is correct that this court held:
[U]nder Article 1998, which is the controlling article for the type of damages referred to by the redhibition articles (specifically Article 2545), if it can be established that the obligee intended  and if the nature of the contract supports this contention  to gratify a significant nonpecuniary interest by way of the contract, and that the obligor either knew or should have known that failure to perform would cause nonpecuniary loss to the obligee, then the requirements for recovery of nonpecuniary damages are satisfied.

Young v. Ford Motor Co., Inc., 595 So.2d 1123, 1133 (La.1992).
The majority finds the lower courts erred in awarding nonpecuniary damages because the plaintiff presented no evidence that the manufacturer knew or should have known that his failure to perform would cause nonpecuniary loss. Although the majority is correct that there was no evidence presented concerning whether the manufacturer, Dynasty Homes, knew or should have known that its failure to perform would cause nonpecuniary loss to the plaintiff, that should not end our inquiry.
Louisiana Civil Code article 1998 provides:
Damages for nonpecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a nonpecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
In written reasons awarding nonpecuniary damages, the trial court stated:
In holding the manufacturer in solido for redhibition under Article 2520, the Court finds the decision of the Third Circuit in Beasley v. Ed's Mobile Home[s], Inc., 824 So.2d 383 (La.App. 3rd Cir.2002) instructive. The Court further finds that, as in the Ed's Mobile Home case, the buyer is entitled to non-pecuniary damages based on the manufacturer's bad faith. That bad faith was due in part to the home being sold as a new home when the manufacturer knew that the home had previous damage and "moisture problems" in the ceiling. It likewise *700 was in bad faith because it knew or should have known when the complaints were made by the plaintiff that the home had not been sealed properly and yet took no steps whatsoever to make the house secure and sealed. The manufacturer continues to downplay the problems with the mobile home as cosmetic only, and continues to attempt to argue that since the home was supposedly built in accordance with the National Manufactured Housing and Construction and Safety Standards, that it has no defects.
(emphasis added).
Although the trial court stated elsewhere in its written reasons that nonpecuniary damages were owed as the plaintiff sufficiently proved his significant nonpecuniary interest in purchasing the home, the court further made a specific finding that the manufacturer was in bad faith because it knew of and concealed from the plaintiff the facts that the mobile home had leaked and had water and ceiling damage before the sale. The second paragraph of La. Civ.Code art. 1998 provides an express exception to the requirement of a nonpecuniary purpose of the contract. That paragraph states:
Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee. (emphasis added).
In my view, finding a manufacturer in intentional bad faith is sufficient to prove the manufacturer "intended, through his failure, to aggrieve the feelings of the" purchaser. In this case, it is clear the plaintiff's repeated demands to the manufacturer to repair the defective mobile home fell upon deaf ears and aggrieved the plaintiff. Thus, I find the trial court was correct in awarding nonpecuniary damages.
The trial court, relying upon Ducote v. Perry's Auto World, Inc., 98-1972 (La. Ct.App. 1 Cir. 11/5/99), 745 So.2d 229, held where there is intentional bad faith, nonpecuniary damages are also allowed. Relying upon Beasley v. Ed's Mobile Homes, Inc., 01-1549 (La. Ct.App. 3 Cir. 4/17/02), 824 So.2d 383, writ denied, 02-1408 (La.9/20/02), 825 So.2d 1170 and Ducote, supra, the trial court found Dynasty Homes, because of its intentional bad faith, owed nonpecuniary damages to the plaintiff.
In Beaseley, the plaintiff purchased a double-wide mobile home. The mobile home contained defects on the date of sale and still had the defects at the time of delivery. The manufacturer authorized a repairperson to submit an estimate of the cost to repair the mobile home; the estimated cost was $5,140. The manufacturer would not approve the repairs because the cost was over $5,000, even though the plaintiff offered to pay the difference of $140 if it would mean the home would be repaired. The trial court awarded judgment in favor of the plaintiff, including $30,000 in general damages.
Affirming the award of general damages in that case, the appellate court observed the evidence did not satisfy the Young requirement that the contract was entered into to satisfy a significant nonpecuniary interest. Beaseley, 01-1549 at p. 9, 824 So.2d at 388. The court further observed that La. Civ.Code art. 1998 provides an express exception to the requirement of a nonpecuniary purpose, and that the record showed the manufacturer engaged in intentional bad faith in failing to make the proper repairs and in failing to approve repair of the home in the amount of $5,140 when plaintiff offered to pay $140. Beaseley, 01-1549 at p. 10, 824 So.2d at *701 389. The manufacturer's failure to repair, knowing that the home was uninhabitable in its defective condition, constituted intentional bad faith on the manufacturer's part. Id. Relying upon Ducote, wherein the First Circuit found that although the purchase of a used automobile was primarily pecuniary in nature, due to the seller's intentional bad faith in failing to inform the buyer of a known defect in addition to failing to repair the vehicle the exception of article 1998 was applicable, the Beaseley court upheld the award of general damages. Id. Although the manufacturer is imputed with bad faith, the record showed the manufacturer engaged in intentional bad faith and thus its bad faith was not merely imputed due to its position as manufacturer of a mobile home. Beaseley, 01-1549 at p. 10, 824 So.2d at 388-89. Where intentional bad faith on the part of the manufacturer is proven, plaintiff should be awarded nonpecuniary damages.
In this case, the trial court found the cost to repair this mobile home would greatly exceed the value of the home. The record is replete with evidence of the failure of the manufacturer to repair the home, which it knew was damaged even before the sale. Regardless of whether plaintiff proved he intended to gratify a significant nonpecuniary interest and that the obligor knew or should have known his failure to perform would cause nonpecuniary loss to the plaintiff, Dynasty Homes's intentional bad faith in selling a damaged mobile home as new and then failing to take any steps to secure and seal the home renders it liable for nonpecuniary damages pursuant to the exception of La. Civ.Code art. 1998. For these reasons, I respectfully dissent from that part of the opinion which reverses the award for mental pain and suffering damages.
NOTES
[1] On November 26, 2002, plaintiff sent Dynasty and Southern Quality Homes written notice of the existence of redhibitory defects as required by La. C.C. art. 2522. The nonexclusive list of defects included: (1) sagging/deflection of the roof system; (2) improperly installed fasteners; (3) lack of eave strip at the edge of the roof; (4) vinyl siding is distorting around the perimeter; (5) improperly sealed sheathing under the mobile home: (6) vapor barrier installed incorrectly; and (7) ceiling drywall panels installed improperly.
[2] Ritter was qualified as an expert in environmental and mechanical engineering.
[3] Mallet was qualified as an expert in general construction, estimating, analysis of construction and design defects, building science, and mold remediation.
[4] In so ruling, the trial court stated that it was "convinced that in order to properly repair the home the detailed steps outlined by Mr. Mallet must be taken and the cost of those repairs will greatly exceed the value of the home." Mr. Mallet estimated the repair costs to be $92,738.43 and outlined the various defects and the party responsible for such defects as follows: improper application of vinyl siding  manufacturer's fault; improper set up of anchor plates-dealer or mover's fault (but found to be not a significant problem); air conditioning duct, cross-over, touching the ground-dealer or installer's fault (but found to be not cause a of moisture); roof fasteners, shingles, and roof eave flashing improperly installed  manufacturer's fault; defective garden tub and shower  manufacturer's fault; leaking ceiling  manufacturer's fault; windows not properly sealed to the frame-manufacturer's fault; air conditioning problemsmanufacturer's fault.
[5] Regarding the improper sealing of the marriage line, the court found as follows:

In deciding this case for the plaintiffs, the Court had some concern about casting the manufacturer in solido for what can only be said would be some significant failing on the part of the seller and installer. The seller is apparently no longer in business and it is obvious from the testimony heard at the trial that the mobile home was not set up properly and that the marriage lines were not sealed properly. However the Court finds that this is a manufacturing problem as opposed to simply an installation problem. While the home was sold by the manufacturer as a single home, it was sold and delivered in two pieces, a "double wide." The manufacturer knew that the two pieces had to be mated and that the seals had to be proper and appropriate. Indeed, that is how the home was designed. The manufacturer, in this Court's view, cannot escape liability because of a moisture problem caused by improper sealing by simply saying that the manufacturer did not actually do the sealing. The manufacturer had the responsibility to see to it that the home was sealed properly. In this particular case the manufacturer was placed on direct notice by the buyer that there was a moisture problem and the manufacturer had ample opportunity to attempt to correct and repair that problem by hiring appropriate contractors to make repairs necessary to seal the mobile home. It was painfully obvious at the time of trial that the repairs had not been made, that the home had not been sealed, and that the moisture problems persisted. The findings of [plaintiff's experts] were detailed and documented. In holding the manufacturer in solido for redhibition under Article 2520, the Court finds the decision of the Third Circuit in Beasley v. Ed's Mobile Home, Inc., 824 So.2d 383 (La.App. 3 Cir.2002) instructive. The Court further finds that, as in the Ed's Mobile Home case, the buyer is entitled to nonpecuniary damages based on the manufacturer's bad faith. That bad faith was due in part to the home being sold as a new home when the manufacturer knew that the home had previous damage and "moisture problems" in the ceiling. It likewise was in bad faith because it knew or should have known when the complaints were made by the plaintiff that the home had not been sealed properly and yet took no steps whatsoever to make the home secure and sealed.
[6] Art. 2323. Comparative fault

A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
C. Notwithstanding the provisions of Paragraphs A and B, if a person suffers injury, death, or loss as a result partly of his own negligence and partly as a result of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced.
[7] Art. 2324. Liability as solidary or joint and divisible obligation

A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
C. Interruption of prescription against one joint tortfeasor is effective against all joint tortfeasors.
[8] The Louisiana Products Liability Act, enacted in 1988, provides that it "establishes the exclusive theories of liability for manufacturers for damages caused by their products." La. R.S. 9:2800.52. However, the LPLA defines "damage" by explicitly excluding amounts recoverable under redhibition for damage to the product and economic loss arising from a deficiency in or loss of use of the product. La. R.S. 9:2800.53(5). Thus, while the LPLA is the exclusive remedy against manufacturers for damages resulting from a defective product, a manufacturer can still be liable for damages in redhibition.
[9] "The seller is bound to declare to the buyer the defects of the thing sold, as far as they are known to him, and if he does not do it, the sale shall be cancelled or the price shall be diminished according to the kind of defects, and the seller shall be liable to damages towards the buyer by the following rules."
[10] "If the seller was acquainted with the defects of the thing, he is liable to all damages towards the buyer, besides the restitution of the price he may have received."
[11] As further explained in Young, "[i]t was in the early years of this century that this court first imputed knowledge of a product's defect to a manufacturer-vendor." Id. (Citing George v. Shreveport Cotton Co., 114 La. 498, 38 So. 432 (1905); Doyle v. Fuerst & Kraemer, Ltd., 129 La. 838, 56 So. 906 (1911)). "This jurisprudential rule has been considered `settled' since at least 1953." Id. at 1127-28 (citing William D. Brown, III, Note, Sales  Implied Warranty  Liability of Producer, 13 La. L.Rev. 624, 627 n. 21 (1953)).
[12] Since the 1996 amendments to La. C.C. arts. 2323 and 2324, courts of appeal have split on the issue of whether La. C.C. arts. 2323 and 2324 apply to abolish solidary liability in redhibition cases. The First and Second Circuits have held that these articles apply to a redhibition suit. Petroleum Rental Tools, Inc. v. Hal Oil & Gas, Co., Inc., 95,1820 (La.App. 1 Cir. 8/22/97), 701 So.2d 213, writ dismissed, 97-3088 (La.2/10/98), 706 So.2d 982; Hampton v. Cappaert Manufactured Housing, Inc., 36,773 (La.App. 2 Cir. 1/29/03), 839 So.2d 363. On the other hand, the Fourth Circuit has held that La. C.C. art. 2323 applies only to "actions based in tort" and that a redhibition suit is a contractual action, not a tort action. Touro Infirmary v. Sizeler Architects, 04-0634 (La.App. 4 Cir. 3/23/05), 900 So.2d 200, 205, writs denied, 04-2114 (La.5/6/05), 901 So.2d 1093 and 05-1315 (La. 1/13/06), 920 So.2d 232.
[13] While Media Productions, supra, did state that the manufacturer was solidarily liable with the seller, neither Media Productions, supra, nor Rey held a manufacturer liable for defects caused by the seller. Further, Media Productions was not technically a redhibition case, but was a product liability case involving a breach of the warranty of reasonable fitness for the product's intended use under La. C.C. art. 2475.
[14] Based on this ruling, we not reach the issue of whether nonpecuniary damages are precluded in redhibition by the LPA.